Curia, per

Butler, J.
I shall assume what seemed to be conceded in argument on both sides, that by its charter of incorporation the City Council of Charleston has vested *773 in it all the powers which the State possessed, at the time, of regulating the pilotage of the harbor of Charleston. Acting under a derivative power from the State, this municipal body had authority to make all ordinances and regulations that might pertain strictly to the subject which had been committed to its jurisdiction. I do not understand that the State-, by this limited delegation of power, ever intended to subject itself to the acts of the City Council in relation to matters connected with the regulation of commerce and navigation of a general character — such for instance as imposing duties on tonage and imports, or of adopting any such measures as might operate with discrimination on the vessels of other States or countries. These were subjects of political importance, and were very properly retained by the State to be regulated and controlled by such legislative measures as its policy and interest might dictate; and the State itself, before the adoption of the federal constitution, might, very well, have questioned any acts of the City Council which would have interfered with its own reserved rights, and which were not confined to the objects contemplated in the grant of power. From time to time commissioners of the Navy were invested with the power of enforcing and regulating existing laws in relation to maratime matters. They had also the power to regulate the pilotage of the different ports. They seem to have been invested with a general supervisory and executive authority on these subjects. Their jurisdiction was rather to enforce laws than to make them, with the power of incidental alteration ; and nothing more was ever intended to be given to the City Council. It had conferred on it all the powers of the commissioners of pilot-age that had been vested in the comhiissioners of the Navy. But if it had been clothed with any higher powers, like the State itself, it could not have exercised them after the adoption of the federal constitution, if they should be repugnant to any of the provisions of that instrument, or the laws of Congress made in conformity with it. For from that time, all the jarring and hostile legislation of the States, in respect to commerce and navigation, became inoperative and were as a dead letter on the statute-book.— From 1789 we must look to Congress and not to the State *774 legislatures for our laws regulating commerce and the shipping interest generally. The police regulation of ports, harbors and inlets,- has been very wisely left by Congress to the States. Inspection laws, quarantine laws, and laws for the government of pilots, are of this kind. The safety and security of local interests would seem to require that these matters should be under the control of State legislation. I am not prepared to say how far Congress could go in interfering with them. They are so intimately connected with local jurisdiction, that they may be said almost to form a part of a system of State laws. Whether their authority at this time may be referred to the act of Congress, which has recognized their validity, or whether they may be regarded as belonging to the States, from the necessity of things, such regulations must be made so as not to be repugnant to the constitution of the U. S. and the laws of Congress. The right of the State to delegate its power over pilotage regulations to the city of Charleston, or of the power of this corporation to adopt such measures as would be within the constitutional competency of the State, has not been questioned by the counsel for the appellant in this case. The authority of the States on this subject is thus recognized and declared by Congress: “That all pilots in the bays, inlets, rivers, harbors and ports of the U. S. shall continue to be regulated in conformity with the existing laws of the States respectively, wherever such pilots may be, or such laws as the States may respectively hereafter enact for the purpose, until further legislative provision shall be made by Congress.” Under the constition, Congress had no right to adopt any other than constitutional regulations; and such only were intended to be declared valid. So that' existing laws, as well as such as might be enacted by the States, must be referred to the constitution for their authority. The question involved in this case, is not whether the ordinance in question has been made in conformity with State or provisional regulations that existed and had been acted on previous to 1789, but whether in its provisions and direct operation it is not repugnant to the federal constitution, or the laws of Com gress regulating matters clearly within its jurisdiction.
The Recorder has decided that “the clause in this ordi *775 riance (the one on which this action is brought) is, as already observed, so 'far as the defendant is concerned, in conformity with the 8th sec. of the Act of 1734, on pilotage, as modified and controlled by the 1st and 2d sections of the Act of the 25th March, 1738;” and concludes, that as these provisions were in force when the act of Congress of 1789 was passed, they were sanctioned and adopted by it. This does not meet the difficulty which has been made in the appeal; for, as was said in argument, all that has been decided may be true, but still the ordinance is subject to the constitutional objections made in the grounds of appeal— and upon which this court is now required to pass its judgment. I do not understand that there is any objection to this ordinance, because, like the Act of 1734, it requires commanders of vessels bearing towards the coast or bar of Charleston, to pay a pilotage fee to the first pilot who should offer to go on board and take charge of their vessels. So far as it regards all foreign vessels whose masters may be supposed to be strangers to the port, this should be regarded both a prudent and humane regulation. Pilots are employed for the purpose of securing life and property from hazard and catastrophe; and it would be a reproach to any government not to make some provision for the prompt enforcement of these highly necessary and important functions. After an examination as to their qualifications, they have to take out a regular license and to enter into bond for the performance of their duties, — some of which subject them to great hardships, privations and perils. They have, frequently, more than earned their fees, by exposing themselves for the purpose of lending assistance to others. Justice would seem to require that they should be compensated for services resulting from the nature of their employment; and humanity and an enlightened regard to prudence would dictate, that temerity and avarice should not putin jeopardy life and property, when it could be avoided. There is nothing unreasonable, therefore, in requiring masters to take on board of their vessels a pilot better qualified than themselves to conduct the vessel over the bar with safety. No doubt many masters could be found who would be willing to take upon themselves all the risks; but their disposition or wishes are not alone to be consulted. *776 Many besides themselves may be interested in the vessel, or its cargo, the safety and security of whose rights and interests are to be protected, by regulations that all prudent men would assent to.
If the ordinance, without discrimination, had required all vessels coming in or going out, to take on board a pilot, or in default to pay a pilotage fee, it would have been equal, and therefore unobjectionable. Or if it had exempted all coasters trading between any ports in this State, from such duty, it could not well be objected to — as they might be supposed, from the nature of their employment, to be well enough acquainted with the difficulties of the navigation to dispense with the employment of a pilot. Most of the regulations in relation to pilots, were passed by the City Council in the year 1807. The 1st clause of those regulations, contained in an ordinance of that year, was, in every respect, similar to the one under consideration, except in this: that it exempted all coasters from liability to pay the fee of a pilot offering to go on board such coasters. By the ordinance of 1842, theonewhich is now before the court, it is provided, that any coaster or commander of a vessel, <fec. bearing towards the coast, <fce. (all coasters and other vessels trading between any ports in this Slate, which are wholly owned in this State,' and all steamboats carrying the U. S. mail, excepted) who shall refuse to receive on board a licensed pilot, <fcc. is made liable, on his arrival in Charleston, to pay such pilot the fees and rates allowed, <fec. The discrimination here made, is between coasters owned wholly in So. Carolina, and such as may be owned in another State, either in whole or in part, but which in every other respect are similarly situated and employed with the Carolina coasters. The one is required to pay the fee or rate allowed by law, whilst the others are entirely exempt; — that is to say, a coaster» owned in Massachusetts, but which is engaged in carrying produce from Beaufort or Georgetown to Charleston, of 12 1-2 feet draft of water, is required to pay $12; whilst a coaster owned wholly in So. Carolina, and engaged in the same business, is entirely exempt from such fee. So of other vessels, the fee depending on the size of the vessel and the supposed capacity of the pilot, (see City Ordinance on this subject.)
*777 It is not the province of this court to enquire into the designs of legislative enactments, or the motives of those who make them. But the operation of a principle, and the obvious effects of a' measure, suggest considerations that may very properly fall under judicial cognizance. They serve to give the true character of an Act; and, on constitutional questions, especially, they should have a decided influence. They afford the legitimate means of depriving bad faith of the pretext of a title, or the concealment of a purpose, under the mere name of an Act. We must, therefore, endeavor to ascertain the true legal character of the ordinance under consideration, by seeing how far its actual operation will affect the commercial and navigation interests of other States. The Act, by its very language, was intended to give a preference, in the harbor of Charleston, to coasting vessels of one State over those of the other States. Under the principle assumed by the city council in this ordinance, there is no limit as to the amount of the pilotage fee that may be exacted from other than the South Carolina coasters, coming in or going out of the port. By increasing the amount, such vessels may be, as it was no doubt intended they should be, entirely excluded from participating in the coasting trade of the State. For if $20 would not effect this purpose, $50 or $100 might. The decency of moderation would afford no restraint on the suggestions of interest or the designs of selfish expediency. Besides, under the same principle, other invidious discriminations might be made, such asprefering the vessels of some States to the exclusion of others. To make the case more palpable, by way of illustration, suppose an ordinance should be passed, saying that all coasting vessels owned in States lying north of South Carolina, should pay a pilotage fee, whilst those to the south should be entirely exempt. Still more odious distinctions might be imagined. In the case supposed, the law would at once strike us as repugnant to the principles of justice and equality contemplated and intended to be secured by the Constitution of the United States. The effect of such legislation would be to give a monopoly to the vessels intended to be favored ; and of course it would lead to retaliatory and hostile legislation on the part of other States *778 whose interests had been affected. It was to guard against vexatious and conflicting legislation of this sort, in relation to commerce, that the federal constitution was main; ly adopted. That instrument, as its history will shew, originated in the design of its authors to impart harmony and uniformity to our commercial regulations, both as it regards the relations of foreign nations and the intercourse of the States with each other. This could not be done but by the authority of one power, and the operation of one rule. Under the article of the federal constitution, that “Congress shall have power to regulate commerce with foreign nations, and amongst the several States, and with the Indian tribes,” no State can have even a concurrent power on the same subject. By the terms used in the article, as well as from the nature of the power conferred, Congress has the exclusive power to regulate commerce, in the most enlarged and liberal sense. In its more limited sense, the term commerce might be confined to buying and selling, or the interchange of commodities. But, by the constitution, it was intended to have a much more extended meaning, as may be seen by referring to other articles of that instrument. If navigation, or the interest of vessels in which commodities are carried, were to be under the regulation of the States, Congress would be deprived of its most efficient means of regulating commerce. Under the power to regulate commerce, navigation must be included ; and, like commerce, is exclusively under the control and regulation of Congress.
This whole subject, and the distinctions here adverted to, underwent a most thorough investigation in the case of Gibbons vs. Ogden, 9 Wheat. The subject involved in that case was one of great political importance and legal magnitude, and was discussed and considered by the ablest minds in America. The judgment of the court in that case may be regarded as settling the doctrine throughout the United States, that the power to regulate commerce is exclusive, and cannot be delegated to the States, or exercised by them concurrently with Congress ; that commerce includes in it navigation, the rights of which may be prescribed and regulated by the legislation of Congress; and that any State law which may be found to conflict with *779 those provisions and regulations, is void and unconstitutional. The reasoning by which this result was attained, has not, since the decision referred to, been seriously controverted, but, as Judge Story remarks, seems to have the cheerful acquiescence of the learned tribunals of a particular State — one of whose Acts brought it first under judicial examination. In reference to these general doctrines, the case before the court must be considered.
It has been contended that the ordinance before the court, until it is controlled or modified by an Act of Congress, must be regarded as having the sanction of that body, and may be regarded as forming a part of their general system for the regulation of commerce, so far as it can be affected by the operation of pilot laws. The Act of Congress does not regard the pilot laws of a State as regulations of commerce; and it would be erroneous to suppose that this ordinance has been sanctioned or adopted by Congress, further than it is consistent with the strict power of a State to make such a law, unconnected with" any express action of Congress, much less to sanction it if it should be found to come in collision with any federal regulation on the subject of navigation,
If the ordinance, therefore, in its necessary operation, (as we think it does,) is one which encroaches on, or in any wise interferes with, the constitutional control of Congress over the same subject, it is void.
But supposing the State to have a concurrent power with Congress, with the consent of that body, on any particular matter, it cannot be denied that when Congress has legislated concerning a subject on which it is authorized to act, all State legislation which interferes with it is absolutely void. It cannot be denied that Congress has power to regulate the coasting trade ; nor was it denied that the vessel in question had all the rights resulting from the license granted under the law of Congress to all coasting vessels. If the ordinance should be found, in its provisions, to be inconsistent with these rights thus secured, or to come in collision with the law of Congress recognizing and regulating them, it must yield to and be subordinate to their authority.
It becomes necessary, then, to enquire what rights the *780 defendant has acquired under his coasting license. The coasting trade was not created by Congress. It was a trade that was carried on before the adoption of the Constitution, by the lex communis of nations ; but it was subject to the conflicting regulations of the different States. The Constitution itself, after its adoption, would have relieved it, as well as the navigation of foreign or other vessels not having a coasting license, from some of their burthens and uncertainties. The 9th section of the 1st article declares, “that no preference shall be given by any regulation of commerce or revenue, to the ports of one State over those of another.; nor shall vessels bound to or from orie State, be obliged to enter, clear, or pay duties in another.” This deprived Congress of the power of making sectional discriminations, and imposed on the States the obligation of obeyiug uniform regulations, emanating from federal authority. The national flag would have given character and protection to American vessels.
The law of Congress of 1793, regulating the coasting trade, is minute in its provisions, and confers on those engaged in .such trade, specific rights and immunities. It presupposes that a vessel applying for a license to carry on the coasting trade, has been regularly enrolled and registered, giving to it its national character. And the 1st sec. of the Act declares that no other shall be deemed ships or vessels of the United States, entitled to the privileges of ships and vessels engaged in the coasting trade, but such as have been enrolled and licensed according to the Act. The Act requires bond to be given, <fec., and after the owner has complied with the requisites of the law, it is made the duty of the collector to grant a license for carrying on the coasting trade. The license concludes with the words, that “a license is hereby granted for carrying on the coasting trade.” The language specifying the terms on which he is to conduct his trade, constitutes the law by which he is to be governed. The manner in which he shall trade from one port to another, in different States, and between ports in the same district, is minutely explained. The master carries with him his authority to prove his right to navigate freely the waters of the United States, and to carry on the coasting trade. His right is as perfect to navi *781 gate these waters, on the conditions specified, as it would be for a mail contractor to drive a stage coach over the public roads. The inlets, harbors, rivers and bays, lying within the territorial jurisdiction of any State, are open to him, and he cannot be excluded from them, except on such conditions as apply to all others similarly situated. It was one of the objects for which the people entered into the Constitution of the United States, that they should stand on an equality in commercial regulations.
Coasting vessels take out their license at one port, in the confidence that they cannot be impeded in the free navigation of the waters of the United States, and that they can enter when and where they please, under their authority, derived from the laws conferring on them their rights. But if they are to have new conditions added at every port they enter, and of which they were not apprized when they took out their license, they would have to conduct their trade, not by a law which regulated and secured their rights, but by regulations of which they were entirely ignorant, and which would destroy all their profits, or subject them to new calculations incident to unforeseen arrangements. When a coaster leaves Boston, or any other port, he should do so in the confidence that his vessel shall find a home in every other port in the Union; or that the laws of one port shall be the laws of the other. His flag and his license should be his unquestioned passports. He has no right to suppose that any State law will be made, either in its object to affect his rights, or in its operation to abridge them — and whenever such law comes in his way, it must yield to the constitutional supremacy of the laws from which he derived his privileges. As Mr. Webster says in his argument in the case of Gibbon & Ogden, “nor is it at all material in this view whether the law of^a State be a law regulating.commerce, or a law of police, or by whatsoever name or title it may be designated.” If its provisions be inconsistent with an Act of Congress, they are void, so far as that inconsistency extends. The law of Congress on the subject under consideration, gives a coaster a right to enter the harbor of Charleston, and the constitution of the United States controls Congress as well as the States in making any regulations that would give *782 a preference to one port over another, or that shall require vessels leaving one port to pay duties in another. The ordinance under review, does not, in terras, impose a duty on the defendant’s vessel for coming into the port of Charleston, from another port. But under the pretext of a pilot law, it requires him to pay a fee that would prevent him from trading on an equality with coasters owned in the State, and would in its operation exclude him from the benefit of the coasting trade in South Carolina altogether. For a law of preference to one class of persons, may be a law of oppression to others. Suppose a similar regulation to the one before the Court to be adopted by other States — the effect would be to give a monopoly of the coasting trade to such States in which these regulations might obtain; the whole tenor and effect of which would be offensive to the spirit and provisions of the constitution of the United States, and inconsistent with the good faith that should pervade all State legislation. As Congress has confided to the States the power of making and regulating pilot laws, they should coqfine themselves with scrupulous care within the scope of their authority. The fact that coasting vessels are entirely owned in South Carolina, can give their masters no better knowledge of the harbor of Charleston, than masters of other coasters who have been engaged in the same trade, and who are therefore equally well acquainted with the navigation. For it might be that a vessel owned in Massachusetts might be navigated by a master born in Charleston, and vice versa, that a vessel owned in Charleston might be navigated by a Boston master; the circumstance of ownership can make no difference. If all the coasters engaged in the same trade, were allowed to carry it on upon the same terms, their masters would have equal opportunities of acquiring a knowledge of the bar, so far as to dispense with the employment of a pilot, of no more knowledge than themselves, and perhaps not so much. Yet, by the present arrangement, an old master that has been familiar with the harbor of Charleston for half his life, may be required to pay a fee to a pilot who may have got his license but yesterday. The law of 1807 recognized no distinction between coasters ; and I have heard of no objection *783 to its operation oh the ground that pilots were necessary for one set of coasters and not for another.
The discrimination and preference contained in the ordinance of 1842 have originated in motives of policy and expediency, which may very well have excused the authors of it from moral blame, but which cannot exempt.the Act from constitutional objection, either on the ground which I have presented, or on another ground which was urged upon the Court by the appellant’s council. That ground is the 4th “Because the said ordinance is also repugnant to the article of the constitntion of the United States which declares that citizens of each State shall be entitled to the privileges and immunities of citizens in the several States.” All the articles which have been referred to seem to concur in their design to secure equal privileges, under the operation of federal legislation. So far as it regards taxation, commercial regulation and naturalization, the laws of Congress must operate with uniformity throughout the United States. In respect to these subjects, the rights of citizens must be the same in one State as in another; and where a State law interferes with an equality actually secured and protected by federal legislation, on matters clearly within the constitutional competency of Congress, it must be held utterly void. The defendant may, with unquestionable propriety, maintain his privilege to enjoy his vested rights resulting from an Act of Congress, obligatory on all the States, as fully in South Carolina as he could have done in Massachusetts; the law, so far as it regards maratime employments, being the same in one place as in the other ; and to be perfect in the advantages conferred by its provisions, it must be free from partial and local legislation. The ordinance of the City Council disregarding this principle, makes a distinction detrimental to one class of citizens, and favorable to another ; and in its practical operation does therefore deprive the citizens of another State, so far as they are interested in the Schooner George Washington, from enjoying the privileges and immunities that are allowed to the citizens of South Carolina, who may be concerned in .the navigation of coasting vessels carrying on their business in the same waters. The following instance will illustrate it: two *784 schooners may leave Georgetown, loaded with rice, one owned in Boston, and the other entirely in Beaufort. • Both may be supposed to have been engaged in the same business for the last 10 years, and therefore equally well acquainted with the bar; and on that account, able and willing to do. without a pilot. They may be supposed to have entered into the business of the trade as competitors upon an entire equality, and to have contracted for their freight precisely on the same terms. When they come in sight of the harbor and are approaching it, as supposed, by the ordinance, twenty, forty or fifty dollars are demanded of one, while the other is allowed to pass. Is not this a preference to one, which is calculated to drive the other out of the trade! and is it not such a distinction, as to allow to the citizens of one State the privileges and immunities that are denied to those of another precisely similarly'situated! In this article of the constitution an equality is recognized only and not enjoined or secured by positive provision. It is rather enumerated than defined. I cannot find that any of the writers or commentators on the constitution have ever undertaken to expound the article, either by explanation or definition; and I shall not quit the concrete of this case by resorting to any abstract disquisitions on the subject — or attempt to do that which others have avoided. This much may be said on the subject with entire confidence — that it is- not in the power of Congress to give privileges to citizens of one State over those of another, by any measure which it can constitutionally adopt; nor can it give to a State a power to do a thing which it could not do itself. It’s laws, whether emanating directly from itself, or whether they recognize as a part of them State regulations, must be uniform. And if the ordinance depends for its authority on the Act of Congress, that Act must be uniform in its operation; and when it ceases to be uniform it becomes null and void pro tanto. The remark of Mr. Webster in another part of his argument in the case quoted is full of meaning — “Under the concurrent power claimed by New York, the State do.es that which Congress cannot do; that is, it gives preferences to the citizens of some States over those of others;” “I do not mean here,” says he; “the *785 advantages conferred on the grantees (those who claimed the exclusive privileges of navigating the waters of New York by steam) but the disadvantages to which it subjects the other citizens of New York. To impose an extraordinary tax on steam navigation visiting the ports of New York, and leaving it free everywhere else, is giving a preference to the citizens of other States over those of New York.” The same remark may be applied to the case of the South Carolina coasters : by giving a monopoly to their vessels, other coasters will be driven from our ports ; and the consequences must be that the citizens of South Carolina interested in having their produce carried to market, will be deprived of the advantages of a free competition, and will in the end have to pay higher rates for freight than the citizens of other States pay. For the benefit to the South Carolina coasters will be alone confined to them, and will operate injuriously on all other classes of citizens. So far as it regards all other classes of persons they are directly interested in free trade and unrestricted navigation. The policy,honor and historical reputation of the State demand that her legislation shall be conducted in good faith, and with an enlightened regard to a free and open commerce. There is a much more imposing justice in a rebuking example, than in the wisdom of doctrinal precepts. The propositions which I would deduce are these, that the ordinance is void, because it is in conflict with powers exclusively vested in Congress, and with subsisting federal laws which are now in force.
2. Because, if the power to pass the ordinance be concurrent, the legislation of the city, referrible to State authority, is in conflict with that of Congress, and is therefore void.
These views do not impugn the principles of the ordinance so far as it depends on the Act of 1734, but repudiate the principle of the legislation of 1738, as inconsistent with the equality and uniformity enjoined by the constitution of the United States.
The motion to reverse the decision below is granted.
Johnson and Dunkin, Chancellors, and Richardson, O’Neall, Evans, Wardlaw and Frost, JJ. concurred.